## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ARNITA AVERY-KELLY, | : | MOTION TO VACATE |
| Fed. Reg. No. 70579-019, | : | 28 U.S.C. §2255 |
|    Movant, | : | |
| | : | CRIMINAL NO. |
|     v. | : | 1:16-CR-442-ELR-JSA-1 |
| | : | |
| UNITED STATES, | : | CIVIL ACTION NO. |
|    Respondent. | : | 1:23-CV-2015-ELR-JSA |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Movant Arnita Avery-Kelly filed a *pro se* motion to vacate pursuant to 28 U.S.C. §2255, challenging her convictions and sentences in the Northern District of Georgia based on *Ruan v. United States*, 597 U.S. 450 (2022) ("*Ruan*"). (Doc. 272). After the Government responded to the motion [Doc. 276], the undersigned granted Movant's motion for appointment of counsel, appointed Jeffrey Lyn Ertel to represent Movant, and provided both parties with additional time for briefing the *Ruan* issue. (Docs. 277, 278, 279). The matter is now before the Court on the §2255 motion [Doc. 272], the answer-response [Doc. 276], Movant's counseled reply [Doc. 285] and the sur-reply [Doc. 286].

I.    Background

At all relevant times, Movant was a licensed doctor of podiatric medicine ("DPM") in the State of Georgia and operated a podiatrist clinic in Lithonia,

Georgia,[1] after which she operated a podiatrist clinic named Podiatric Medical Surgical Spa in Atlanta, Georgia. (Doc. 200, Presentence Investigation Report ("PSR") ¶11). Unlike medical doctors ("MD"s) who are educated at medical schools and are licensed to treat the entire human body, podiatrists are educated at podiatry schools and have a limited medical license to treat the foot and leg below the knee. (Doc. 216 at 55, 109). As a general practice DPM, Movant advertised treatment for fungal nails, calluses, hammer toes, knee pain, ingrown toenails, corns, bunions, ankle pain, heel spurs, and wounds. (Doc. 165-8 at 12).

Movant came to the attention of the Georgia Drugs and Narcotics Agency ("GDNA") via reports by pharmacists that they received several oxycodone prescriptions written by Movant. (Doc. 216 at 57-58; PSR ¶12). Those pharmacists thought it suspicious that a podiatrist would prescribe a strong Schedule II controlled substance, as they had never before seen a podiatrist write any such prescriptions. (Doc. 216 at 57-58; PSR ¶12).[2] After discovering several more oxycodone

---

[1]    Movant leased space in a chiropractor's office in Lithonia. (Doc. 219 at 225; Doc. 165-8 at 15).

[2]    At trial, several witnesses testified that there were five schedules of controlled substances: Schedule I includes narcotics that are highly abused and have no approved medical purpose; Schedule II includes narcotics that are as highly abused, but do have a legitimate medical purpose and can be prescribed; Schedule III includes narcotics that are a little bit less abusive but still abused on the street and are addictive; Schedule IV includes narcotics that are considered mainly sedatives such as valium or Xanax; and Schedule V includes a few cough syrups with codeine.

prescriptions written by Movant, the GDNA referred Movant's case to the federal Drug Enforcement Agency ("DEA"). (PSR ¶20). A confidential source ("CS") informed DEA agents that although Movant advertised as a podiatry clinic, she actually was operating as a pain clinic – for which she was not licensed. (*Id.*). The CS also admitted to "sponsoring" several individuals who went to Movant's clinic.[3] (*Id.* ¶27).

Based on that information and several more pharmacist reports that Movant had been continuing to write prescriptions for large quantities of strong oxycodone, DEA agents began an investigation, including, *inter alia*, surveilling Movant's clinic and utilizing undercover agents in an effort to obtain more information. (*Id.* ¶¶14, 22, 24, 25, 26, 31, 49). The DEA learned that Movant's practice was primarily a cash business, and that she charged approximately $300 for the first visit and $225 for follow-up visits. (*Id.* ¶50). Aside from the fact that many of Movant's patients paid in cash to fill their strong opiates prescriptions, DEA agents also noted from their review thereof that many travelled long distances to obtain those prescriptions. (*Id.* ¶14). Overall, Movant wrote 5,141 fraudulent prescriptions for narcotics and

(*See, e.g.,* Doc. 216 at 55-56). Schedule I and II controlled substances are the most in demand and the most abused. (*Id.* at 56).

[3]      Sponsoring occurs when a narcotic pill trafficker finances others with cash or drugs to go to a pain clinic to obtain and fill narcotics prescriptions. (PSR ¶28).

caused a total of 470,756 dosage units of controlled substance prescriptions to be filled.  (*Id.* ¶83).

II.    Procedural History

On February 28, 2018, a federal grand jury in the Northern District of Georgia returned a sixty-one count first superseding indictment against Movant and Brenda Lewis, Movant's office manager, charging them with operating a pill mill from late 2013 until April 2016.[4]  (Doc. 99).  Movant specifically was charged with conspiracy to unlawfully dispense controlled substances in violation of 21 U.S.C. §846 (Count One); using and maintaining a premises for the purpose of unlawfully distributing and dispensing controlled substances in violation of 21 U.S.C. §856(a)(1) (Counts Two and Three); and fifty-eight counts of unlawfully distributing and dispensing controlled substances without a legitimate medical purpose and outside the usual course of professional practice in violation of 21 U.S.C. §§841(a)(c) and (b)(1)(C). (Counts Four through Sixty-One).  (*Id.*).[5]

---

[4]    The original indictment was entered on December 21, 2016.  (Doc. 1).  The first superseding indictment did not change the substantive charges.  (*Compare* Doc. 1 with Doc. 99).

[5]    Counts Four through Eleven charged Movant with unlawfully dispensing controlled substances to "T.J." on eight specific dates from March 2015 through December 2015; Counts Twelve through Thirty-Two charged her with unlawfully dispensing controlled substances to "T.N." on twenty-one specific dates from January 2014 through October 2015; and Counts Thirty-Three through Sixty-One charged her with unlawfully dispensing controlled substances to "T.S." on thirty-two specific dates from February 2014 through December 2015.  (Doc. 99).

During a jury trial from April 22 to May 15, 2019, the Government called eighteen witnesses, including undercover DEA Agent Terrance Woodard (acting as "T.J."), podiatry expert DPM Michael McGlamry, pain management expert MD Richard Reisman, codefendant Brenda Lewis, and others. (*See* Docs. 216, 217, 218, 219, 220, 221, 222). Movant did not testify or present any evidence. (Doc. 221 at 3).

At trial the Government elicited a lot of testimony about Georgia's Prescription Drug Monitoring Program ("PDMP"), which is a database that keeps track of controlled substances prescribed to patients. (Doc. 216 at 149, 191). The PDMP is part of the rules and regulations of the Georgia Composite Medical Board ("GCMB"), which applies to MDs.[6] (*Id.* at 82-83). The PDMP also can be used to isolate controlled substances prescribed by a particular doctor, and the underlying data used to create the PDMP comes from reports by pharmacies that fill controlled substances prescriptions. (*Id.* at 149, 191; Doc. 218 at 128-29). Doctors prescribing controlled substances use the PDMP to make sure that patients are not getting controlled substances from other doctors – which is a red flag indicating that patients are seeking pills for non-medical reasons such as addiction – and the DEA utilizes

---

[6]    In contrast, the Georgia State Board of Podiatry Examiners regulates the practice of podiatry. (Doc. 216 at 81, 83).

the PDMP for investigative purposes.  (Doc. 218 at 129; Doc. 219 at 233; Doc. 220 at 18).

In her proposed jury instructions, Movant asked that the Court read GCMB Rules 360-38.04 and .05 to the jury.  (Doc. 146 at 31-32).  Rule 360-38.04 provides that as of July 1, 2018, prescribers of controlled substances are required to check a patient's name in the PDMP database before prescribing any such controlled substance, and to make a notation that the prescriber did so or justify why the prescriber could not check the PDMP database.  (Doc. 146 at 31; Ga. Comp. R. & Regs. R. 360.38.-.04).  Under Rule 360-38.05, a prescriber's failure to comply with the GCMB rules and regulations – including those rules and regulations relating to the PDMP – is grounds for disciplinary action.

The Government filed a *motion in limine* to preclude Movant from attempting to use the GCMB rules to infer that Movant was an MD as opposed to a DPM not subject to those regulations – including Rules 360-38.04 and .05 about which she requested the jury instruction – because any such instruction would be confusing, misleading, and irrelevant.  (Doc. 147).  The Court did not include Movant's proposed instruction in the Court's charge to the jury.  (Doc. 221 at 21-43).

In relevant part, the Court charged the jury that:

A controlled substance is lawfully prescribed by a practitioner if he or she prescribed the controlled substance as part of his or her medical treatment of a patient in accordance with the standards of professional practice generally recognized and accepted in the state of Georgia.

The terms legitimate medical purpose and usual course of professional practice again refer to the standard of professional practice and treatment generally recognized and accepted in the state of Georgia.

To determine these standards, you may consider the totality of the circumstances, including evidence of the accepted standard of professional practice in effect at the time, and expert testimony.

A podiatrist who prescribes a controlled substance for a patient in compliance with the accepted standard of podiatric practice in the state of Georgia is not committing a crime. Rather, a podiatrist has violated section 841(a)(1) when the government proves beyond a reasonable doubt that the podiatrist's actions were without legitimate medical purposes or were outside the usual course of professional practice.

Whether the defendant acted outside the usual course of professional practice is to be judged objectively by reference to standards of podiatric practice generally recognized and accepted in the state of Georgia. Therefore, whether the defendant had a good belief – excuse me, good faith belief that she dispensed a controlled substance in the usual course of her professional practice is irrelevant.

However, whether the defendant acted without a legitimate medical purpose depends on the defendant's subjective belief about whether she was dispensing the controlled substance for a legitimate medical purpose. Therefore, in order for the government to establish that the defendant was acting without a legitimate medical purpose, the government must prove beyond a reasonable doubt that the defendant did not subjectively believe that she was dispensing the controlled substance for a legitimate medical purpose.

(*Id.* at 36-37).

7

The jury began deliberating at 2:05 p.m. on April 30, 2019.  (*Id.* at 114).  At 4:25 p.m., the jury asked a two-part question seeking clarification as to the meaning of "dispense" and requesting to review witness Shakita Toney's health record.  (*Id.* at 116-24).[7]  After the Court responded [*Id.* at 122-23], the jury left for the evening.  (*Id.* at 125).

At 10:34 a.m. during deliberations the next day, the jury asked for a black marker, pens, and tape, and to review the "big file" of all of Movant's patients – all of which the Court provided.  (Doc. 222 at 3-8).  The jury sent another note to the Court at 3:45 p.m., asking two questions, *i.e.,* when PDMP reports were first available in Georgia and when was it required to read them.  (*Id.* at 8).  The Court responded that the evidence was closed and thus it could not answer those substantive questions.  (*Id.* at 10).  Neither the Government nor Movant objected to that response, and the jury continued to deliberate until 4:30 when they were excused for the evening.  (*Id.* at 11-12).

---

[7]    Ms. Toney testified that she went to Movant's clinic with Courtney Baker – a person about whom some witnesses testified was selling controlled substances he received from Movant [*see* Doc. 219 at 9] – and waited for Baker while he went to the back and talked to Movant.  (Doc. 219 at 131-45).  According to Ms. Toney, Movant never examined her; however, Baker gave her a prescription in Ms. Toney's name for Hydromorphone on two occasions and paid her $100 to fill those prescriptions.  (*Id.*).  Ms. Toney denied having filled out two different medical forms in the record which purportedly diagnosed her with chronic pain syndrome and osteoarthritis.  (*Id.*).

The next day, however, Movant's counsel reminded the Court that Movant's original proposed request to charge the jury regarding the GCMB rules was directly on point based on the questions raised by the jury. (*Id.* at 13). Movant's counsel asked the Court to read that proposed charge in response thereto, and the Government again opposed it. (*Id.* at 13-17). The Court revisited the objection but still found that the charge should not be read to the jury. (*Id.* at 17).

At the same time, the jury continued its deliberations and sent another note to the Court around 10:35 a.m. (*Id.* at 20). This time, the note indicated that the jurors had reached a decision on several counts, *i.e.,* Twenty-Four through Thirty-Two and Forty-Four through Sixty-One, but were unable to agree on the remaining charges. (*Id.*). The note emphasized that some jurors "will not, under any circumstances" be persuaded to change their mind or even continue a discussion, and the foreperson indicated that he could not see how the jury could render a decision on each of those counts. (*Id.*).

The Court discussed the options with the parties, that is, whether to allow the jury to continue deliberating or accept the verdict on Counts Twenty-Four through Thirty-Two and Forty-Four through Sixty-One and decide how to handle the

remaining counts. (*Id.* at 20-24). Following that discussion, the Court opted to read the jury the *Allen*[8] charge and have the jurors continue deliberating.[9] (*Id.* at 20-24).

After the jury deliberated for another hour and twenty minutes, the Court inquired about where they were with their deliberations. (*Id.* at 25-27). The foreperson responded that they may have come to an agreement on another group of counts, but that some of the jurors' opinions were so firm on a few key issues that he did not see a reasonable chance of them changing their minds. (*Id.* at 27-28). Another juror requested that she have an opportunity to bring up one more point to the rest of the jurors to see if it would make a difference. (*Id.* at 28). Based on that discussion, the Court allowed the jurors to take a lunch break and then resume deliberations. (*Id.* at 29).

About an hour after the jury returned from lunch the Court received a note from the foreperson, who indicated that after some points of evidence were presented from new angles the jury had engaged in another discussion, but after a vote those jurors with "entrenched positions" on the major issues had not changed their minds.

---

[8]    "An '*Allen* charge' is a trial court's admonition to a deadlocked jury, instructing it to make further attempts to reach a verdict." *United States v. Castronuovo*, 649 F. App'x 904, 919 (11th Cir. 2016) (citing *United States v. Polar*, 369 F.3d 1248, 1254 (11th Cir. 2004)) (internal quotation marks omitted).

[9]    The Government wanted the option the Court chose; however, Movant's counsel thought the note was so unequivocal that the Court should take the verdict on the counts the jury had decided and declare a mistrial as to the remainder. (Doc. 222 at 21-22).

(*Id.* at 30).  Based thereon, in addition to the previous note and the Court's *Allen* charge, the Court decided to bring the jury out and accept the verdict.  (*Id.* at 32). After the Court confirmed that the jurors were at an impasse and could not work out a unanimous decision on the remaining counts, the Court accepted the guilty verdicts on Counts Twenty-Four through Thirty-Two and Forty-Four through Sixty-One and declared a mistrial on the remaining counts.  (*Id.* at 34-37; Docs. 163-64).  On October 8, 2019, the Court sentenced Movant to a total of 180 months of imprisonment.  (Docs. 191, 192).

Movant filed a direct appeal with the Eleventh Circuit on October 21, 2019, and challenged the Court's refusal to issue the proposed jury instruction regarding the PDMP, both in the initial charges and in response to the jury's question.  *United States v. Avery-Kelly*, 842 F. App'x 520 (11th Cir. 2021) (per curiam); (Doc. 245). On February 5, 2021, the Eleventh Circuit affirmed Movant's convictions.  *Id.* Movant did not file a petition for certiorari with the United States Supreme Court.

Meanwhile, on December 28, 2020, Movant filed a *pro se* motion for compassionate release under 18 U.S.C. §3582(c)(1)(A), as amended by Section 603(b) of the First Step Act, and later filed an amended motion after the undersigned appointed counsel to represent her.[10]  (Docs. 239, 242, 252).  The Court denied the

---

[10]    First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).

motion on May 19, 2021, and Movant filed an appeal thereof. (Docs. 259, 260). On

March 24, 2022, the Eleventh Circuit affirmed that denial. *United States v. Avery-*

*Kelly*, No. 21-11981, 2022 WL 873732 (11th Cir. Mar. 24, 2022) (per curiam); (Doc.

268).

Movant executed a *pro se* motion to vacate her convictions on March 29,

2023, and argues that this Court should vacate her convictions based on *Ruan*, which

will be discussed more thoroughly herein. The Government responded that

Movant's claim is procedurally defaulted. (Doc. 276). After the undersigned

appointed Mr. Ertel [Doc. 278], Mr. Ertel filed a reply brief on Movant's behalf and

argued that trial and appellate counsel's failure to raise the *Ruan* issue constituted

cause that would excuse a procedural default, and that Movant suffered prejudice

therefrom. (Doc. 285). The Government filed its sur-reply [Doc. 286], and the

matter is ripe for resolution. For the following reasons, the undersigned

**RECOMMENDS** that the instant §2255 motion be **DENIED**.

III.    Discussion

    A.    Standard of Review

A federal prisoner may file a motion to vacate his or her sentence under 28

U.S.C. §2255 if "the sentence was imposed in violation of the Constitution or laws

of the United States, or that the court was without jurisdiction to impose such

sentence, or that the sentence was in excess of the maximum authorized by law, or

is otherwise subject to collateral attack." 28 U.S.C. §2255(a). "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Movant must establish that the facts surrounding her claim present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Bowen v. Johnston*, 306 U.S. 19, 27 (1939).

Because there are no disputed issues of fact and the record is sufficiently developed to determine the issues here, an evidentiary hearing is not necessary, and the Court may rely on the written submissions. *See* 28 U.S.C. §2255(b); *Schiro v. Landrigan*, 550 U.S. 465, 473-75 (2007); *Sosa v. United States*, 550 F.2d 244, 250 (5th Cir. 1977) (Tuttle, J., dissenting) ("[T]he requirement of a hearing was intended by Congress as protection for the petitioner only in that it was to prevent summary dismissals of section 2255 motions. The right of the Government to a hearing only if legal questions were presented was not, . . . within the purpose of Congress in enacting the statute."); *United States v. McBain*, No. 06-CR-364 (JNE) (1), 2022 WL 2872788, at *2 n.3 (D. Minn. July 21, 2022) ("[C]ourts in this circuit have recognized that relief may be granted where the record 'either conclusively resolves all material factual disputes against the government or raises no disputed questions of fact that are material to [the] decision.'") (quoting *Rogers v. United States*, 949 F. Supp. 2d 879, 885 (N.D. Iowa 2013)); *Blackmon v. United States*, No. 3:16-CV-

1080 (VAB), 2019 WL 3767511, at *7 (D. Conn. Aug. 9, 2019) ("Where no material facts are in dispute, . . . the court may use its discretion to rely on the written record submitted to the court rather than hold an in-person hearing to decide the applicable questions of law.").

B.     The Supreme Court's Decision In *Ruan*

Under 21 U.S.C. §841, it is unlawful "'*[e]xcept as authorized*[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance.'" *Ruan*, 597 U.S. at 457 (quoting 21 U.S.C. §841(a)) (alterations and emphasis in original). A doctor violates §841 if she writes a prescription for a controlled substance without a "legitimate medical purpose" and "outside the usual course of [her] professional practice." *Id.* at 454 (quoting 21 C.F.R. §1306.04(a) (2021)) (internal quotation marks omitted).

At the time of Movant's trial and appeal, in order to convict a defendant under 21 U.S.C. §841 Eleventh Circuit precedent "required the government to show that a defendant subjectively knew [s]he was acting not for a legitimate medical purpose[.]" *United States v. Duldulao*, 87 F.4th 1239, 1251 (11th Cir. 2023). "But it did not require the same showing with respect to whether a doctor violated §841 by prescribing a controlled substance outside the usual course of professional practice." *Id.* Instead, the focus was "'whether, from an objective standpoint, the

controlled substances were dispensed in the usual course of professional practice.'" *Id.* (citations omitted).

Put another way, when determining whether a doctor violated §841 by prescribing a controlled substance outside the usual course of professional practice, the doctor's subjective intent or good faith belief that she was meeting a patient's medical needs by prescribing a controlled substance was irrelevant. *Id.*; *see also Ruan*, 597 U.S. at 456; *United States v. Ruan*, 966 F.3d 1101, 1119-36 (11th Cir. 2020) ("*Ruan I*") (holding Eleventh Circuit precedent required rejecting defendants' request for good-faith instruction because the "usual course of professional practice" prong was evaluated using an objective, not a subjective, standard even though it was relevant to the question of whether a doctor prescribed a controlled substance for a "legitimate medical purpose"); *United States v. Tobin*, 676 F.3d 1264, 1280 (11th Cir. 2012) (finding that the district court correctly granted the government's motion *in limine* to exclude evidence that the defendants subjectively believed that they were not committing the offenses, because "any evidence that the defendants had a sincere belief that their distribution of controlled substances was in conformity with the law would be 'irrelevant' to the distribution counts"), *overruled on other grounds as recognized by United States v. Castro*, 736 F.3d 1308 (11th Cir. 2013)).

In *Ruan*, the Supreme Court specifically rejected the Eleventh Circuit's distinction that unlike the "legitimate medical purpose" subjective inquiry the "usual

course of professional practice" was evaluated objectively. *Ruan*, 597 U.S. at 461, 465; *Duldulao*, 87 F.4th at 1251. After *Ruan*, therefore, in order to establish criminal liability under §841, the Government must prove that the defendant subjectively knew she was acting not for a medical purpose *and* subjectively knew that the controlled substances were not dispensed in the usual course of professional practice. *Dudulao*, 87 F.4th at 1251; *see also United States v. Ruan*, 56 F.4th 1291, 1296 (11th Cir. 2023) ("*Ruan III*") (per curiam) ("[T]o obtain a conviction under [§841], the government must prove beyond a reasonable doubt that a defendant (1) knowingly or intentionally dispensed a controlled substance; and (2) knowingly or intentionally did so in an unauthorized manner.").

IV.    Analysis

Movant argues that *Ruan* dictates that her convictions be vacated because the Court instructed the jury that it was irrelevant whether Movant had a good faith belief that she dispensed a controlled substance in the usual course of her professional practice – which is the precise objective standard the Supreme Court rejected in *Ruan*. *Ruan*, 597 U.S. at 452; *Ruan III*, 56 F.4th at 1297. In other words, Movant was convicted under what has since been found to be erroneous jury instructions that potentially include innocent conduct.

The Government responds that Movant's *Ruan* claim is procedurally defaulted. In other words, because her counsel did not challenge the jury

instructions, which were correct under then-current precedent, the Government argues that Movant cannot do so now on collateral attack, even though that precedent has since been overturned. Through new counsel, Movant replies that ineffective assistance of trial and appellate counsel constitutes cause for the procedural default, and that but for that ineffective assistance there is a reasonable probability that Movant would have prevailed in the appellate process. (Doc. 285).

As explained below, the Court agrees with the Government. In the end, Movant is caught between an impossible vice that underlies many instances of procedural default. The argument she makes now was theoretically available and could have been asserted at trial and appeal. However, it would have been pointless to do so under then-current Circuit precedent, and therefore counsel cannot be said to have been ineffective for foregoing the argument. In other words, because counsel could have but did not make this almost-certainly losing argument, Movant now is stuck without recourse with a conviction based on undisputedly erroneous instructions.

The result here is harsh, but it is dictated by the controlling law that the undersigned is bound to apply. For the following reasons, **IT IS RECOMMENDED** that the motion to vacate be **DENIED**.

    A.   <u>Timeliness</u>

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal prisoners must file a 28 U.S.C. §2255 motion to vacate within one year of the latest of four specified events:

(1)    the date on which the judgment of conviction becomes final;

(2)    the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)    the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)    the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2255(f).  Both parties' arguments rely on §2255(f)(3) to conclude that the instant motion is timely based on the presumption that *Ruan* is retroactively applicable on collateral review.  (*See* Doc. 276 at 3; Doc. 285).[11]

Notably, this is not a settled question in this Circuit. Courts in this Circuit, including the Eleventh Circuit itself – albeit in an unpublished panel opinion available only on Lexis+ – have concluded the opposite, that is, that *Ruan* does not apply retroactively for purposes of the § 2255 time bar.  *See e.g. In re Blanc*, No.

---

[11]    Specifically, the Government states that despite the fact that the Supreme Court and the Eleventh Circuit have not held that *Ruan* is retroactively applicable, the decision in *Ruan* will "likely" be made retroactive. (Doc. 276 at 3; Doc. 285 at 6).

22-12527-F, 2022 U.S. App. LEXIS 2440, at *4-5 (11th Cir. Aug. 31, 2022) ("*Ruan* did not announce a new rule of constitutional law but, rather, clarified the *mens rea* that the government must prove to convict a defendant under §841. . . . The Supreme Court interpreted §841 using established rules of statutory construction, which does not announce a new rule of constitutional law within the meaning of §2255.") Nevertheless, as the issue of timeliness is not raised by the Government, and as the timeliness of the petition is not jurisdictional, the Court finds it inappropriate to raise this question *sua sponte*. Thus, the Court assumes, *arguendo*, that *Ruan* applies retroactively and that the instant petition was filed in a timely manner, and proceeds to the remainder of the analysis.

B.    Movant's Claims Are Procedurally Defaulted.

        1.    Relevant Law

Even if Movant's *Ruan* claim is timely, both parties concede that it is procedurally defaulted.  "A claim is procedurally defaulted, such that the prisoner cannot raise it in a collateral proceeding, when a defendant could have raised an issue on direct appeal but did not do so." *Hill v. United States*, 569 F. App'x 646, 647 (11th Cir. 2014) (per curiam); *see also Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004) ("Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a 28 U.S.C. §2255 challenge.").

The movant can "avoid the procedural bar by establishing that either of the following exceptions applies: (1) cause and prejudice, or (2) a miscarriage of justice based on actual innocence." *Hill*, 569 F. App'x at 648. "[T]o show cause for procedural default [a §2255 movant] must show that some objective factor external to the defense prevented [the movant] or [her] counsel from raising [the] claims on direct appeal and that this factor cannot be fairly attributable to [the movant's] own conduct." *Lynn v. United States*, 365 F.3d 1225, 1235 (11th Cir. 2004) (per curiam). "Actual prejudice means more than just the possibility of prejudice; it requires that the error worked to [the movant's] actual and substantial disadvantage[.]" *Ward v. Hall*, 592 F.3d 1144, 1179 (11th Cir. 2010).

The standard for evaluating ineffective assistance of counsel claims was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Green v. Nelson*, 595 F.3d 1245, 1239 (11th Cir. 2010). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 688). To establish deficiency, a petitioner is required to establish that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a petitioner must prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694; *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 750 (11th Cir. 2010).

"An attorney's performance is not deficient in hindsight just because he or she made one choice versus another." *Scott v. United States*, 890 F.3d 1239, 1259 (11th Cir. 2018); *see also Willis v. Newsome*, 771 F.2d 1445, 1447 (11th Cir. 1985) (per curiam) ("Tactical decisions do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course."). A court may "dispose of ineffectiveness claims on either of its two grounds." *Atkins v. Singletary*, 965 F.2d 952, 959 (11th Cir. 1992); *see also Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). The *Strickland* standard also applies to claims of ineffective assistance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013).

### 2.    Movant Has Not Demonstrated Cause.

Movant argues as cause that counsel was ineffective for failing to preserve and/or raise the *Ruan* issue at trial and on appeal. (Doc. 285 at 8-9). As discussed previously herein in Section III.B., however, binding Eleventh Circuit precedent at the time of Movant's trial and appeal foreclosed the position adopted by the Supreme Court in *Ruan*. *See Duldulao*, 87 F.4th at 1251; *Ruan I*, 966 F.3d at 1119-36; *Tobin*,

676 F.3d at 1280.  Because binding precedent made the *Ruan* issue a meritless claim at the time of Movant's trial and appeal, counsel cannot be considered deficient for failing to raise it.  *See Wimbush v. United States*, No. 8:22-cv-205-MSS-TGW, 2023 WL 1619434, at *2 (M.D. Fla. Apr. 15, 2024) (holding counsel was not ineffective for failing to raise an issue foreclosed by binding precedent); *see also Garcia v. Sec'y, Fla. Dep't of Corr.*, No. 21-12461, 2023 WL 5927136, at *3 (11th Cir. Sept. 12, 2023) (per curiam) ("[C]ounsel is not ineffective for failing to raise claims reasonably considered to be without merit.") (internal quotation marks and citations omitted); *Franks v. GDCP Warden*, 975 F.3d 1165, 1170 (11th Cir. 2020) ("[W]e have repeatedly held that if a particular claim itself is without merit," any failure of counsel to raise or adequately pursue it "'cannot constitute ineffective assistance of counsel'") (citations omitted).

What's more, it is well-settled in the Eleventh Circuit that an attorney's failure to anticipate a change in the law also does not constitute ineffective assistance.  *See, e.g., United States v. Finley*, 805 F. App'x 823, 827 (11th Cir. 2020) (per curiam) ("This Court's precedent clearly forecloses an ineffective-assistance-of-counsel claim based on failure to raise an objection that would not succeed under current law, but which could succeed depending on a forthcoming Supreme Court

decision.");[12] *Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013) ("'[I]t generally does not fall below the objective standard of reasonableness for trial counsel to fail to raise a claim in anticipation that undeniably would lose under current law but might succeed based on the outcome of a forthcoming Supreme Court decision."); *United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001) ("In this circuit, we have a wall of binding precedent that shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel."); *Jones v. United States*, 224 F.3d 1251, 1257-58 (11th Cir. 2000) ("Since the district court would be required to follow the law of this circuit until it was overruled by the Supreme Court or an *en banc* panel of this court, it was not completely unreasonable for counsel to make a strategic decision to forego a

---

[12]    The issue in *Finley* is eerily similar to Movant's *Ruan* claim here. Specifically, the defendant in *Finley* was convicted and sentenced under 18 U.S.C §§922(g) and 924(e) for knowingly possessing a firearm as a convicted felon. *Finley*, 805 F. App'x 823. Thereafter, the Supreme Court issued its opinion in *Rehaif v. United States*, 588 U.S. 225 (2019), which overturned Eleventh Circuit precedent and clarified the *mens rea* the government was required to prove for any such conviction. *Finley*, 805 F. App'x 823. On appeal Finley argued that counsel's ineffective assistance for failing to raise a *Rehaif* claim was cause for his procedural default thereof. *Finley*, 805 F. App'x at 826.

The Eleventh Circuit found that counsel could not have been ineffective for failing to raise a claim that was foreclosed by Eleventh Circuit precedent before *Rehaif* was decided. *Id.* at 827. Likewise, at the time of Movant's trial and appeal the Eleventh Circuit foreclosed a *Ruan* claim before *Ruan* was decided; therefore, as in *Finley*, counsel could not have been ineffective for failing to raise it.

claim that was a loser under the then-current state of the law."); *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'").  And this rule – *i.e.,* that counsel is not ineffective for failing to anticipate a change in the law – applies regardless of whether the argument "was reasonably available at the time counsel failed to raise it."  *Geter v. United States*, 534 F. App'x 831, 836 (11th Cir. 2013) (per curiam); *see also Sanchez*, 2023 WL 8418024, at *9 (finding counsel could not have been ineffective for failing to anticipate the holding in *Ruan*); *United States v. Ignasiak*, No. 3:08cr27/LAC/MAL, 2024 WL 947997, at *5 (N.D. Fla. Feb. 15) ("To the extent Ignasiak implies that attorney Adkinson was ineffective for failing to predict the United States Supreme Court's June 2022 ruling in *Ruan*, his claim must fail.") (footnote omitted), *report and recommendation adopted*, 2024 WL 943928 (N.D. Fla. Mar. 5, 2024).  Thus, Movant has failed to demonstrate that ineffective assistance of counsel constitutes cause for the procedural default of the *Ruan* claim, and this Court need not reach the prejudice prong.  Consequently, this Court cannot review Movant's claim.

V.    <u>Conclusion</u>

Based on the foregoing reasons, **IT IS HEREBY RECOMMENDED** that Arnita Avery-Kelly's motion to vacate her sentence [Doc. 276] be **DENIED WITH PREJUDICE**.

## VI.  Certificate Of Appealability

Pursuant to Rule 11 of the Rules Governing §2255 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."    28 U.S.C. §2253(c)(2) provides that a certificate of appealability ("COA") may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  In order for the certification requirement to fulfill its function of weeding out frivolous appeals, a court should not automatically issue a COA; rather, the applicant must prove "something more than the absence of frivolity" or "the existence of mere 'good faith' on his or her part."  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (citations omitted).

Movant need not prove, however, that some jurists would grant the §2255 motion.  *See id.*  "The question is the debatability of the underlying constitutional claim, not the resolution of that debate."  *See Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009) (citing *Miller-El*, 537 U.S. at 325).  In other words, Movant need only demonstrate that "reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Based on the foregoing discussion, reasonable jurists would not find "debatable or wrong" the undersigned's determination that Movant's claim is untimely and/or procedurally defaulted. *See Slack*, 529 U.S. at 484.

Accordingly, **IT IS FURTHER RECOMMENDED** that a COA be denied.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**IT IS SO RECOMMENDED** this 11th day of September, 2024.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE